IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

MARIO WILLIAMS,

        Plaintiff,

vs.

        Case No. 22-cv-234-JAR

CORECIVIC, et al.,

        Defendants.

**DEFENDANT CORECIVIC'S MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN SUPPORT**

Submitted by:
DARRELL L. MOORE, OBA 6332
COURT PLACE AT NORTH VANN
P.O. BOX 368
PRYOR, OK  74362
(918) 825-0332/7730 FAX
darrellmoore@jralphmoorepc.com
ATTORNEY FOR DEFENDANT
10 AUGUST 2026

# TABLE OF CONTENTS

BACKGROUND ... 2

STATEMENT OF UNCONTROVERTED FACTS ... 2

SUMMARY JUDGMENT STANDARD ... 7

ARGUMENT AND AUTHORITIES ... 8

PROPOSITION:

Plaintiff was not subjected to use of Excessive Force; No reasonable
trier of fact will determine otherwise; Summary Judgment
should be granted in favor of Defendant ... 9

    A.  The Bravo South Housing Unit ... 9

    B.  The Bravo South housing unit
was on "lockdown" on March 31, 2022 ... 10

    C.  Though Bravo South was in a "lockdown"
status, inmates came out of their cells. ... 11

    D.  The SORT response to Diaz-Mendez's
radio call was reasonable and necessary ... 15

CONCLUSION ... 18

## TABLE OF AUTHORITIES

### Statutes & Court Rules:

Federal Rules of Civil Procedure, Rule 56 ........................................................ 1

Eastern District LCvR 56.1 ........................................................ 1

Eastern District LCvR 7.1(p) ........................................................ 1

### Case Law:

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, (1986) ........................................................ 8

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................ 8

Connick v. Thompson, 563 U.S. 51, 60 (2011) ........................................................ 17

County of Sacramento v. Lewis, 523 U.S. 833, 854 (1998) ........................................................ 9

Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671 (10th Cir.2002) ........................................................ 9

Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ........................................................ 17

Hudson v. McMillian, 503 U.S. 1, 7 (1992) ........................................................ 2

Kingsley v. Hendrickson, 576 U.S. 389, 402 (2015) ........................................................ 9

Monell v. N.Y. City Dep't of Soc. Serv., 436 U.S. 658, 691 (1978) ........................................................ 17

True v. United States, 190 F.3d 1165 (10th Cir.1999) ........................................................ 8

Whitley v. Albers, 475 U.S. 312 (1986) ........................................................ 9

Williams v. Miller, 696 Fed.Appx. 862, 869-870 (10th Cir. 2017) ........................................................ 17

EXHIBITS

SUPPORTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

22-CV-234-JAR

1.    OKDOC offender lookup Mario Williams #225143 redacted

2.    Mario Williams housing history report at Davis facility

3.    Officer Diaz-Mendez deposition excerpts

4.    Officer Diaz-Mendez training transcript

5.    Bravo South Housing History Report March 31, 2022

6.    SORT Operator and certified instructor Del Bosque deposition excerpts

7.    SORT Operator and certified instructor Del Bosque training transcript

8.    Senior SORT Commander Trujillo deposition excerpts

9.    Bravo South housing unit photographs

10.   SORT Operator and certified instructor Del Bosque written statement March 31, 2022

11.   Incident Notification Report

12.   Misconduct hearing packet redacted

13.   Warden Norwood deposition excerpts

14.   Chief of Security Brown deposition excerpts

15.   CoreCivic Policy 9-1, Use of Force and Restraints

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

MARIO WILLIAMS,

    Plaintiff,

vs.             Case No. 22-cv-234-JAR

CORECIVIC, et al.,

    Defendants.

---

## DEFENDANT CORECIVIC'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT.

---

COMES NOW Defendant CoreCivic, Inc. by and through their attorney of record, Darrell L. Moore, OBA #6332, and pursuant to the Federal Rules of Civil Procedure, Rule 56, LCvR 56.1, and the Minute Order entered by this Court on August 3, 2026 (Docket No. 91) do submit their merits-issue Motion for Summary Judgment.

In the claim remaining for consideration by the Court, Plaintiff asserts he was subjected to an unconstitutional and excessive use of force during corrections staffs' response to an officer's Code 1 call for assistance. The Officer, by himself, was faced with approximately thirty (30) inmates inside a housing unit who were refusing to comply with the Officer's verbal commands to return to their assigned cells. The undisputed evidence demonstrates that the force used by staff was applied in a good-faith effort to restore discipline and order to the housing unit and was not applied in a wanton and malicious manner intended to cause harm. No reasonable jury will conclude otherwise.

1

Pursuant to LCvR 7.1(p), the reasons supporting judgment being granted in favor of this Defendant on Plaintiff's remaining claim alleging a use of excessive force are set out more fully in an accompanying brief incorporated herewith.

## BACKGROUND

Plaintiff Mario Williams, ODOC# 225143 is an inmate in custody of the Oklahoma Department of Corrections. Plaintiff is currently confined at Oklahoma DOC's facility located near Hominy, Oklahoma. At the time of the incident complained of by Plaintiff, March 31, 2022, Plaintiff was housed by the Oklahoma Department of Corrections at CoreCivic's medium-security/maximum-security prison facility in Holdenville, Oklahoma.

Prior to October 1, 2023, the prison facility was known as the Davis Correctional Facility. On Oct. 1, 2023, CoreCivic leased the prison facility to the Oklahoma Department of Corrections for DOC operations, and the facility was renamed by Oklahoma DOC as the Allen Gamble Correctional Center. Because Plaintiff's allegations predate the lease agreement and for the purpose of clarity and continuity, Defendant will continue in this Motion for Summary Judgment and Brief to refer to the prison facility as the Davis facility or Davis Correctional Facility.

## STATEMENT OF UNCONTROVERTED FACTS

1.      Plaintiff is an inmate confined to the custody of the Oklahoma Department of Corrections. *See* Exhibit 1, Plaintiff Williams' OKDOC Offender Lookup page.

2.      Plaintiff was placed for housing by the Oklahoma Department of Corrections at Davis Correctional Facility on November 24, 2021. *See* Exhibit 2, Housing History Report, Mario Williams, DOC #225143.

2

3.      Christopher Diaz-Mendez, currently a patrol officer with the Oklahoma City Police Department, was employed by CoreCivic at the Davis Correctional Facility as a Corrections Officer during 2022.  *See* Exhibit 3, Diaz-Mendez deposition, Page 6, Lines 16-25 and Page 9, lines 2-25.

4.      Prior to being assigned to work as a Corrections Officer in the inmate housing units at the Davis Correctional Facility, Diaz-Mendez completed a six-week training program that included use of force training.  *See* Exhibit 3, Diaz-Mendez deposition, Page 19, Lines 3-10 and Page 20, Lines 3-10.

5.      Diaz-Mendez's training at the Davis Correctional Facility included instruction on and use of de-escalation techniques when dealing with inmates.  *See* Exhibit 3, Diaz-Mendez deposition, Page 64, Lines 14-25 and Page 65, lines 1-15; *see also* Exhibit 4, Diaz-Mendez training transcript.

6.      Diaz-Mendez's training at the Davis Correctional Facility included instruction on and use of verbal commands, use of OC spray (oleoresin capsicum), pepper ball system, and hand-to-hand defensive measures.  He was also trained in radio-calling for supervisors and additional staff for assistance.  *See* Exhibit 3, Diaz-Mendez deposition, Page 10, Lines 1-18, Page 25, lines 11-22, and Page 34, Lines 1-13.

7.      On March 31, 2022, Diaz-Mendez was posted to work on the dayshift inside the Bravo South housing unit, one of the facility's medium-security housing units. *See* Exhibit 3, Diaz-Mendez deposition, Page 22, Lines 1-5,  and Page 25, lines 11-22.

8.      On March 31, 2022, Diaz-Mendez was not too familiar with the medium-security inmates housed on the Bravo-South housing unit. Diaz-Mendez had more often

3

been posted to work in one of the facility's maximum-security housing units. *See* Exhibit 3, Diaz-Mendez deposition, Page 24, Lines 14-24.

9. On March 31, 2022, 114 inmates were housed on the Bravo South housing unit at the Davis Correctional Facility. Plaintiff was housed in cell 232. *See* Exhibit 5, Housing History Report for March 31, 2022.

10. On March 31, 2022, during Officer Diaz-Mendez shift, the Bravo South housing unit was on "lockdown." A "lockdown" meant that inmates were to remain inside their assigned cells. *See* Exhibit 3, Diaz-Mendez deposition, Page 27, Lines 2-7, and Page 61, Lines 4-10.

11. While Diaz-Mendez was going cell-to-cell passing out lunch trays to the locked down inmates, inmates started coming out of their cells. *See* Exhibit 3, Diaz-Mendez deposition, Page 28, Lines 19-25.

12. Diaz-Mendez estimated about 30 inmates came out of their cells. *See* Exhibit 3, Diaz-Mendez deposition, Page 29, Lines 1-8 and Page 30, Lines 1-25.

13. Diaz-Mendez gave verbal commands to the inmates to return to their cells, but the inmates refused to comply with his verbal commands. *See* Exhibit 3, Diaz-Mendez deposition, Page 29, Lines 1-8, Page 32, Lines 5-20, and Page 79, Lines 2-7.

14. After the inmates refused to comply with his verbal commands to return to their cells, Diaz-Mendez made a Code 1 radio call because so many inmates had come out of their cells and the housing unit was on "lockdown." A Code 1 radio call means an officer needs help. *See* Exhibit 3, Diaz-Mendez deposition, Page 29, Lines 1-8, Page 33, Lines 1-25, Page 34, Lines 1-13, Page 45, Lines 16-25, and Page 67, Lines 12-18.

4

15.    Diaz-Mendez described the situation facing him on the Bravo South housing unit as "scarry" and "it was just one of me, at least 30 of them" and "scarry, I thought is was scarry, you go to a survivor mode." *See* Exhibit 3, Diaz-Mendez deposition, Page 29, Lines 1-8, Page 31, Lines 7-11, and Page 80, Lines 6-17.

16.    Several members of SORT (special operations response team) responded to the Bravo South housing unit because of the Code 1 radio call for assistance made by Officer Diaz-Mendez.  *See* Exhibit 3, Diaz-Mendez deposition, Page 36, Lines 17-25; *see also* Exhibit 6, Del Bosque deposition, Page 70, lines 1-20.

17.    The SORT response officers entered the Bravo South housing unit and gave verbal commands to the inmates to return to their cells. The inmates did not comply with the verbal commands.  *See* Exhibit 3, Diaz-Mendez deposition, Page 36, Lines 17-25, Page 46, Lines 1-4, Page 67, Lines 12-18; *see also* Exhibit 6, Del Bosque deposition, Page 71, lines 5-12, Page 75, Lines 7-23, Page 77, Lines 10-15, Page 82, Lines 18-21, Page 84, Lines 2-4, Page 137, Lines 15-20, and Page 140, Lines 10-17.

18.    Officer Marcos Del Bosque, a SORT certified officer, was one of the responders to the Bravo South housing unit on March 31, 2022.  Del Bosque was a certified chemical agents and pepper ball systems instructor. *See* Exhibit 6, Del Bosque deposition, Page 17, lines 5-13, Page 18, Lines 23-25, Page 18, Lines 1-2, Page 38, Lines 19-25, Page 40, Lines 19-25, and Page 141, Lines 12-23; *see also* Exhibit 7, Marcos Del Bosque training transcript.

19.    Florentino Trujillo has been employed by CoreCivic for 21 years and is a Senior SORT Commander and certified pepper ball instructor.  *See* Exhibit 7, Trujillo

5

deposition, Page 10, Lines 15-25, Page 13, Lines 7-14, Page 14, Lines 7-12, Page 17, Lines 11-16, Page 20, Lines 22-25, and Page 21, Lines 1-21.

20.    When the inmates that were out of their cells on the Bravo South housing unit did not comply with the SORT verbal commands to return to their cells, Officer Del Bosque used a pepper ball system in an effort to gain inmate compliance with the Officers' commands.  *See* Exhibit 3, Diaz-Mendez deposition, Page 36, Lines 17-25, Page 38, Lines 1-5; *see also* Exhibit 6, Del Bosque deposition, Page 71, lines 5-12, page 75, Lines 7-23.

21.    The pepper ball contains micronized powder. The ball bursts upon impact with a wall or hard surface and releases the powder.  *See* Exhibit 7, Trujillo deposition, Page 36, Lines 1-13, Page 86, Lines 9-23.

22.    The Bravo South housing unit is a two-story inmate housing unit, with inmate cells upstairs and inmate cells downstairs.  *See* Exhibit 8, photos of Bravo South housing unit; *see also* Exhibit 3, Diaz-Mendez deposition, Page 22, Lines 1-5.

23.    Inmates were out of their cells upstairs and downstairs on Bravo South on March 31, 2022, when SORT members responded to Officer Diaz-Mendez's Code 1 call on March 31, 2022.  *See* Exhibit 6, Del Bosque deposition, Page 83, lines 6-10.

24.    Officer Del Bosque used a pepper ball system to direct pepper balls at the walls of the upper tier of the Bravo South housing unit in order to saturate the area.  *See* Exhibit 6, Del Bosque deposition, Page 75, Lines 7-23, Page 88, lines 3-14, Page 89, Lines 14-18.

25.    The pepper balls were directed at cell doors and walls. *See* Exhibit 6, Del Bosque deposition, Page 83, lines 6-10; *see also* Exhibit 3, Diaz-Mendez deposition, Page 42, Lines 10-14.

26.     Officer Del Bosque used a 2 or 3-round burst employment technique about four times to saturate the Bravo South housing unit area.  *See* Exhibit 10, Marcos Del Bosque written statement dated March 31, 2022.

27.     Using a 3-round burst employment technique for area saturation is a use of force technique taught during pepper ball system training. *See* Exhibit 7, Trujillo deposition, Page 105, Lines 21-25 and Page 106, Lines 1-4.

28.     The pepper balls were not aimed into cells or directly at inmates who were out of their assigned cells. *See* Exhibit 6, Del Bosque deposition, Page 88, lines 3-14, Page 133, Lines 17-19, Page 150, Lines 12-25, Page 151, Lines 1-16; *see also* Exhibit 3, Diaz-Mendez deposition, Page 42, Lines 10-14.

29.     Using the pepper ball system on the Bravo South housing unit resulted in all inmates returning to their cells.  *See* Exhibit 6, Del Bosque deposition, Page 107, lines 19-25, Page 108, Lines 1-9, Page 139, Lines 11-24; *see also* Exhibit 3, Diaz-Mendez deposition, Page 38, Lines 1-5, Page 70, Lines 1-15.

30.     Once the inmates complied with the Officers' orders and returned to their assigned cells, facility medical staff checked the inmates and the responding SORT members stayed on the Bravo South housing unit until the medical staff left the housing unit. *See* Exhibit 6, Del Bosque deposition, Page 75, lines 7-23; *see also* Exhibit 3, Diaz-Mendez deposition, Page 38, Lines 1-5, Page 70, Lines 1-15.

31.     An Incident Notification Report was prepared by Chief of Unit Management Dorman.  The report identified thirty-one inmates were involved.  Medical staff were reported as having made rounds on Bravo South and inmates Sabo, Jones, and

Petty were examined by medical staff. The report noted inmates were allowed to decontaminate in their cells.  *See* Ex. 11, Incident Notification Report dated April 1, 2022.

32.    Mario Williams was outside of his assigned cell in the Bravo South housing unit at the time the pepper ball system was used on March 31, 2022. *See* Ex. 11, Incident Notification Report dated April 1, 2022; *see also* Exhibit 6, Del Bosque deposition, Page 150, Lines 12-25 and Page 151, Lines 1-16.

33.    Mario Williams was issued a disciplinary write-up following the incident of March 31, 2022.  Mario Wiliams pled not guilty to the misconduct charge of tampering with a security device.  At a subsequent hearing, the Disciplinary Hearing Officer found Mario Williams not guilty of tampering with a security device.  *See* Ex. 12, Disciplinary hearing packet.

<u>**SUMMARY JUDGMENT STANDARD**</u>

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986).  The issue of material fact is genuine only if a party presents facts sufficient to show that a reasonable jury could find in favor of the non-movant.  *See* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The existence of a factual issue does not preclude summary judgment where there is no evidence to support a dispute on that issue, or the evidence is so one-sided that no reasonable juror could find for the other side.  *See* <u>True v. United States</u>, 190 F.3d 1165, 1177 (10th Cir.1999).  In opposing a motion for summary judgment, the non-moving party must come forward with enough evidence to

support a jury verdict.  Conclusory allegations will not suffice.  *See* Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671, 675 (10th Cir.2002).

## ARGUMENT AND AUTHORITIES

## PROPOSITION:

**Plaintiff was not subjected to use of Excessive Force; No reasonable trier of fact will determine otherwise; Summary Judgment should be granted in favor of Defendant.**

The core judicial injury in an excessive force case brought by a convicted prisoner under the Eighth Amendment requires a subjective inquiry into whether force was applied in a good-faith effort to maintain or restore discipline *or* maliciously and sadistically to cause harm.  *See* Whitley v. Albers, 475 U.S. 312 (1986); *see also* Hudson v. McMillian, 503 U.S. 1, 7 (1992); *see also* County of Sacramento v. Lewis, 523 U.S. 833, 854 (1998); *see also* Kingsley v. Hendrickson, 576 U.S. 389, 402 (2015).

### A. The Bravo South Housing Unit.

Plaintiff Williams was housed in the Bravo South housing unit at the Davis Correctional Facility.  He had been housed in that housing unit since November 24, 2021.  *See* Exhibit 2, Housing History Report, Mario Williams, DOC #225143.

On March 31, 2022, one hundred and fourteen (114) inmates were housed on the Bravo South housing unit. *See* Ex. 5, Bravo South Housing History Report for March 31, 2022.

According to Warden Joe Norwood, on March 31, 2022, inmates housed on the Bravo South housing were a mix of offenses/convictions, race, and gang affiliations.  *See* Ex. 13, Norwood deposition, Page 29, Lines 18-25, Page 30, Lines 1-25.  Warden Norwood testified that the overall Davis Correctional Facility inmate population had a

9

"pretty high level" of gang/security threat group inmates. *See* Ex. 13, Norwood deposition, Page 41, Lines 2-14. The Oklahoma Department of Corrections determined which inmates from the overall OK DOC population were placed at the Davis facility for incarceration. *See* Ex. 13, Norwood deposition, Page 150, Lines 19-22. At the Davis Correctional Facility, inmates did assault Officers. *See* Ex. 13, Norwood deposition, Page 46, Lines 8-25.

As reflected on the Incident Notification Report, exhibit 11, of the thirty-one (31) inmates identified as having been out of their cells on March 31, 2022, the controlling sentences for these inmates involved murder (first and second degree), crimes against minors, assault and battery with weapons, and robbery with firearms. At the Davis Correctional Facility, inmates did assault Officers. *See* Ex. 13, Norwood deposition, Page 46, Lines 8-25. And, as noted by Officer Diaz- Mendez, "inmates fight a lot, start fires, stab each other." *See* Ex. 3, Diaz-Mendez deposition, Page 59, Lines 8-23.

Typically, one Corrections Officer was posted inside the Bravo South housing unit during each shift. *See* Ex. 13, Norwood deposition, Page 34, Lines 10-23. If an Officer posted inside a housing unit decided he needed assistance, the Officer could use his radio to call for assistance. *See* Ex. 3, Diaz-Mendez deposition, Page 10, Lines 2-14; *see also* Exhibit 14, Kevin Brown, Chief of Security deposition, Page 81, Lines 3-24.

### B. The Bravo South housing unit was on "lockdown" on March 31, 2022.

Joe Norwood was the Warden at Davis Correctional Facility during 2022. At the time of his deposition earlier this year, he had approximately 41 years of corrections experience. *See* Ex. 13, Norwood deposition, Page 20, Lines 12-14, and Page 157, Lines 1-25.

10

Not long after he became Warden at the Davis facility, Warden Norwood requested a deployment of SORT members be sent to the Davis Correctional Facility to help conduct a search of the entire facility for contraband, to include searching for home-made weapons. *See* Ex. 13, Norwood deposition, Page 68, Lines 17-24. SORT members are skilled and have received specialized training to conduct shakedowns of a prison facility. *See* Ex. 13, Norwood deposition, Page 47, Lines 5-16, Page 52, Lines 6-10; *see also* Exhibit 14, Kevin Brown deposition, Page 31, Lines 4-23.

During a facility shakedown, the facility is on lockdown. *See* Exhibit 14, Kevin Brown deposition, Page 31, Lines 4-23. "Lockdown" means inmates are not to come out of their cells. *See* Ex. 3, Diaz-Mendez deposition, Page 59, Lines 8-23. On March 31, 2022, Corrections Officer Diaz-Mendez was posted for duty inside the Bravo South housing unit. *See* Ex. 3, Diaz-Mendez deposition, Page 25, Lines 11-22. As he began his shift that day, March 31, 2022, the inmates housed on Bravo South were on "lockdown." *See* Ex. 3, Diaz-Mendez deposition, Page 27, Lines 2-7. On March 31, 2022, shortly before 1:00 p.m., Correctional Officer Diaz-Mendez was going from cell to cell on Bravo South, passing out the lunch meal trays to the locked down inmates. *See* Ex. 3, Diaz-Mendez deposition, Page 27, Lines 2-7. Suddenly, inmates started coming out of their cells. *See* Ex. 3, Diaz-Mendez deposition, Page 28, Lines 19-25.

### C. Though Bravo South was in a "lockdown" status, inmates came out of their cells.

Officer Diaz-Mendez estimated about thirty (30) inmates suddenly came out of their cells. *See* Ex. 3, Diaz-Mendez deposition, Page 30, Lines 1-25. He recently described the situation on that day as "scarry, I thought it was scarry, you go to a survivor mode." *See* Ex. 3, Diaz-Mendez deposition, Page 31, Lines 7-11, Page 80, Lines 6-17. There was one

11

of him and at least thirty of them. *See* Ex. 3, Diaz-Mendez deposition, Page 29, Lines 1-8. Officer Diaz-Mendez gave verbal commands to the inmates to return to their cells, but they did not comply with his verbal commands. *See* Ex. 3, Diaz-Mendez deposition, Page 32, Lines 5-20. There were so many inmates that had come out of their cells, and the housing unit was under a "lockdown" Officer Diaz-Mendez called a Code 1 on his radio, asking for help. *See* Ex. 3, Diaz-Mendez deposition, Page 33, Lines 1-25, Page 34, Lines 1-13.

Kevin Brown was Chief of Security at the Davis facility for six years and he was Chief of Security on March 31, 2022. According to Chief Brown it was appropriate for Officer Diaz-Mendez to call for assistance in this situation. Diaz-Mendez was the only Officer on the unit at that time and with this number of inmates not complying with his verbal commands, the matter had become a group disruption. *See* Ex. 14, Kevin Brown deposition, Page 81, Lines 3-24, Page 82, Lines 20-25, and Page 85, Lines 16-25. Warden Joe Norwood testified that when inmates are refusing to comply with an Officer's orders, the Officer should call for assistance. *See* Ex. 13, Norwood deposition, Page 96, Lines 1-5.

### D. The SORT response to Diaz-Mendez's radio call was reasonable and necessary.

Officer Del Bosque and several other SORT members responded to Officer Diaz-Mendez's radio call asking for assistance inside Bravo South. *See* Ex. 6, Del Bosque deposition, Page 70, Lines 1-20.

After the SORT officers entered the Bravo South housing unit, they gave verbal commands to the inmates to return to their cells, but the inmates refused. *See* Ex. 6, Del Bosque deposition, Page 71, Lines 5-12, Page 75, Lines 7-23, Page 77, Lines 10-15, Page 82, Lines 18-21, Page 84, Lines 2-4. Inmates told the SORT officers that they were not

12

going to comply with the verbal commands to return to their cells.  *See* Ex. 6, Del Bosque deposition, Page 137, Lines 15-20.

Officer Diaz-Mendez estimated that 30 inmates were out of their assigned cells and were not complying with orders to return to their cells.  *See* Ex. 3, Diaz-Mendez deposition, Page 29, Lines 1-8.  The Incident Notification Report later identified thirty-one inmates out of their assigned cells. *See* Ex. 11, Incident Notification Report.  When you compare the Incident Notification Report listing of names of inmates out of their cells to each inmate's actual housing assignment shown on the Bravo South Housing History Report, Ex. 5, you can see that the inmates out of their cells were upstairs and downstairs and on all sides of the triangular-shaped housing unit. *See* Ex. 9, photos of the Bravo South housing unit.

Officer Del Bosque was an experienced SORT operator, with more than 20 SORT deployments.  *See* Ex. 6, Del Bosque deposition, Page 20, Lines 13-18. Officer Del Bosque was a chemical agents instructor and a certified pepper ball system instructor. *See* Ex. 6, Del Bosque deposition, Page 17, Lines 5-13 and 23-25, Page 18, Lines 1-2, Page 38, Lines 19-25, and Page 40, Lines 19-25.

Using a pepper ball system, Officer Del Bosque impacted 2-3 pepper balls rounds into the walls of the upper tier above the cell doors, about four times, to obtain area saturation of OC pepper spray. *See* Ex. 6, Del Bosque deposition, Page 88, Lines 3-14, Page 89, Lines 14-18.  Lieutenant Trujillo, a senior SORT commander with twenty years of experience, described the area saturation technique and testified that the area saturation technique used by Officer Del Bosque is a use of force technique taught during pepper ball training.  *See* Ex. 8, Trujillo deposition, Page 80, Lines 21-25, Page 81, Lines 1-9, Page

13

105, Lines 21-25, and Page 106, Lines 1-4. According to Chief of Security Brown, use of the pepper ball system to gain inmate compliance with Officers' orders is appropriate and is an authorized use of force measure. *See* Ex. 14, Brown deposition, Page 35, Lines 9-25, Page 86, Lines 5-25. According to Warden Joe Norwood, use of the pepper ball system to gain inmate compliance with Officers' orders is authorized. *See* Ex. 13, Norwood deposition, Page 104, Lines 15-25.

After Officer Del Bosque employed the pepper ball saturation technique in the Bravo South housing unit, the inmates complied with the Officers' orders, and the inmates returned to their assigned cells. *See* Ex. 3, Diaz-Mendez deposition, Page 38, Lines 1-5.

The facility's medical staff then made rounds to check on the inmates and the SORT members stayed on the Bravo South housing unit until the medical staff had exited the housing unit. *See* Ex. 6, Del Bosque deposition, Page 107, Lines 19-25, Page 108, Lines 109. Three inmates were reported as having been examined by the facility's medical staff after the incident. *See* Ex. 11, Incident Notification Report.

The pepper balls contain a micronized powder that is released when the ball bursts against a hard surface, like a wall. *See* Ex. 8, Trujillo deposition, Page 36, Lines 1-13, Page 86, Lines 9-23. Chief Brown described his own exposure to pepper ball powder like this – "I mean, I didn't think it was unpleasant but I did feel like it would make you comply to whatever you are being told or go to where you are supposed to be and not where you are not supposed to be." *See* Ex. 14, Brown deposition, Page 37, Lines 7-23. Officer Del Bosque, a certified SORT operator and pepper ball system certified instructor, testified that when he was exposed to pepper ball powder, he was afterwards able to decontaminate himself with sink water. *See* Ex. 6, Del Bosque deposition, Page 132, Lines 10-19.

14

CoreCivic Policy 9-1, Use of Force and Restraints defines *reasonable force* as follows – *Force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider reasonable and necessary to subdue an attacker, overcome resistance, gain custody, or gain compliance with an order.* *See* Ex. 15, Policy 9-1, Use of Force and Restraints, Page 2.

During his deposition testimony, former Chief of Security Kevin Brown discussed the *use of force continuum.* Chief Brown stated, "It is where you use the least amount of force necessary to gain compliance, and then it is depending on the situation that continuum is on the scale, and it slides." When he was then questioned about the use of force being on a sliding scale, he responded further, "Yeah, the least amount to then depending on compliance or noncompliance you increase the use of force." *See* Ex. 14, Brown deposition, Page 38, Lines 7-17.

On Page 5 of Policy 9-1, E. Use of Force Options, Ex. 15, the Policy guidance states the following:

*Every effort should be made to anticipate, and defuse in advance, those situations which might give rise to conflict, confrontation, and violence. Use of force options should only be used when attempts to gain voluntary cooperation from an inmate/detainee have not been successful or the circumstances require use of force as outlined in this policy. Any time force is used, the amount and type of force used will be the amount that is reasonable and necessary to control the situation /individual. The circumstances of each incident will determine which use of force option is reasonable and necessary to control the incident. Use of force options should only be utilized by employees who have successfully completed training in force options that are authorized at their facility and based upon this policy, contractual requirements, and the statutory laws.*

As has been previously discussed herein, Officer Diaz-Mendez's efforts to gain the inmates' voluntary compliance with his verbal commands were unsuccessful. The responding SORT members similarly tried to gain the inmates' voluntary compliance with their verbal commands for the inmates to return to their cells, with no success. During his

15

deposition, Chief Brown discussed the use of pepper balls and said that the system (i.e., the pepper balls contain pepper powder like pepper spray) was designed for crowd control. When he was asked to further explain, he stated as follows – "Well, you disperse it to gain compliance when you have a group of individuals that are not complying." *See* Ex. 14, Brown deposition, Page 35, Lines 6-25.

Warden Norwood, during his deposition, stated that the Davis facility had a pepper ball system and it was available for staff use. *See* Ex. 13, Norwood deposition, Page 80, Lines 12-19. Officer Marcos Del Bosque was trained in the use of the pepper ball system and was a certified instructor on the use of the pepper ball system. *See* Ex. 6, Del Bosque deposition, Page 17, Lines 5-13, 23-25, Page 18, Lines 1-2, Page 38, Lines 19-25, and Page 40, Lines 19-25.

Whether Officers' actions were objectively reasonable, or unreasonable, turns on the facts and circumstances of each particular case. A Court must make its determination from the perspective of a reasonable officer on the scene, including what the Officer knew at the time, not with the 20/20 vision of hindsight. *See* <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 397 (2015).

No reasonable trier of fact will conclude that Officer Diaz-Mendez and/or Officer Del Bosque used excessive force in obtaining compliance with their orders for the inmates to go back to their cells. Officer Del Bosque and the SORT members responding to Diaz-Mendez's Code 1 call for help used reasonable and necessary force to gain compliance from 31 inmates out of their cells and who had not complied with repeated verbal commands to return to their cells. Though Plaintiff Williams may have experienced some limited amount of discomfort from his exposure to the pepper powder contained in the

16

pepper balls Officer Del Bosque used for area saturation, no reasonable trier of fact will conclude that the pepper powder area saturation had been done for any reason other than as was articulated by Chief of Security Brown – the pepper ball system when used for area saturation is very helpful in gaining compliance from a non-complying group of inmates. No reasonable trier of fact will conclude that the pepper ball use on March 31, 2022, inside the Bravo South housing unit was applied for the unnecessary, malicious, and wanton infliction of pain.

With no underlying *constitutional rights violation* by an Officer on March 31, 2022, there is no liability for CoreCivic, Inc. Vicarious liability is not a cognizable basis for relief under Section 1983. *See* Connick v. Thompson, 563 U.S. 51, 60 (2011).  Similarly, with no underlying constitutional rights violation, there is no cognizable basis for relief under a *Monell* theory that a *constitutional rights violation* occurred because of CoreCivic policies, customs, or usage.  *See* Monell v. N.Y. City Dep't of Soc. Serv., 436 U.S. 658, 691 (1978).

Even assuming, *arguendo,* that an Officer's actions inside the Bravo South housing unit on March 31, 2022, somehow deviated from CoreCivic's Policy 9-1 Use of Force and Restraints, Ex. 15, failure to comply with internal regulations does not give rise to a constitutional violation.  The Plaintiff still must prove that an Officer violated his constitutional rights.  Section 1983 claims require a violation of federal constitutional rights, not merely internal policy violations.  *See* Williams v. Miller, 696 Fed.Appx. 862, 869-870 (10th Cir. 2017); *see also* Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993).

The use of force applied on March 31, 2022, was a good-faith effort to maintain or restore discipline.  No reasonable trier of fact will conclude otherwise.  Summary judgment

17

in favor of Defendant on Plaintiff's remaining claim is appropriate at this time and is respectfully requested.

## CONCLUSION

WHEREFORE, Defendant CoreCivic respectfully requests the Court enter its order of judgment in favor of Defendant and against the Plaintiff; that the Court dismiss the Plaintiff's allegations as set forth above; that the Plaintiff take nothing by way of his petition herein; and, that the Defendant be awarded their attorney fees and costs for defense of this action and receive any and all other appropriate relief.

Respectfully submitted,

By: _____
DARRELL L. MOORE, OBA 6332
P.O. Box 368
Pryor, OK 74362
(918) 825-0332/7730 fax
darrellmoore@jralphmoorepc.com
Attorney for Defendant CoreCivic, Inc.

### Certificate of Service

☑ I hereby certify that on August 10, 2026, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Counsel of record

_____
DARRELL L. MOORE

18