# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARIO WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>CORECIVIC, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 6:22-cv-234-JAR |

## OPINION AND ORDER

This matter comes before the Court on the motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 by defendant CoreCivic, Inc. ("CoreCivic"). [Dkt. 92].[1] Plaintiff Mario Williams ("Williams"), an inmate in the custody of the Oklahoma Department of Corrections ("ODOC"), brings this action under 42 U.S.C. § 1983 based on the use of a pepper ball system inside a housing unit at David Correctional Facility ("DCF") on March 31, 2022. His remaining claim alleges that he was subjected to excessive force in violation of the Eighth Amendment and that CoreCivic is liable for that violation under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). CoreCivic seeks summary judgment on the following grounds: (1) the force used on March 31, 2022 was applied in a good-faith effort to restore discipline, and no reasonable trier of fact could find otherwise; and (2) absent an underlying constitutional violation by one of its officers, CoreCivic cannot be held liable under *Monell*. Williams submitted a response in opposition [Dkt. 97], and CoreCivic filed a reply [Dkt. 98].

---

[1] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers assigned by ECF.

## I. UNDISPUTED MATERIAL FACTS

The following facts are undisputed for summary judgment purposes, except where otherwise noted.[2]

### A. THE BRAVO SOUTH HOUSING UNIT

Williams is an ODOC inmate who was placed for housing at DCF on November 24, 2021. [Dkt. 92, ¶¶ 1-2; Dkt. 97, ¶¶ 1-2]. Christopher Diaz-Mendez ("Diaz-Mendez") began working for CoreCivic as a Corrections Officer at DCF in January 2022. [Dkt. 92, ¶ 3; Dkt. 97, ¶ 3; Dkt. 97, ¶ 41; Dkt. 98, ¶ 41]. Before assuming his post, Diaz-Mendez completed a six-week training program that included instruction on the use of force, de-escalation techniques, verbal commands, oleoresin capsicum spray, the pepper ball system, and hand-to-hand defensive measures. [Dkt. 92, ¶¶ 4-6; Dkt. 97, ¶¶ 4-6].

On March 31, 2022, Diaz-Mendez was posted to work the dayshift inside the Bravo South housing unit ("Bravo-S"), one of DCF's medium-security housing units. [Dkt. 92, ¶ 7; Dkt. 97, ¶ 7]. Bravo-S is a two-story unit with inmate cells on both levels. [Dkt. 92, ¶ 22; Dkt. 97, ¶ 22]. At the time, 114 inmates were housed in Bravo-S, including Williams, who was assigned to cell 232. [Dkt. 92, ¶ 9; Dkt. 97, ¶ 9].

According to CoreCivic, Bravo-S was on "lockdown" that day, meaning "inmates were to remain inside their assigned cells." [Dkt. 92, ¶ 10]. The record

---

[2] CoreCivic's "Statement of Uncontroverted Facts" ("SOF") appears at pages 6 through 22 of its motion. [Dkt. 92 at 6-22, ¶¶ 1-33]. Williams' responses to the SOF appear at pages 7 through 11 of his brief, [Dkt. 97 at 7-11, ¶¶ 1-33], and his "Additional Facts Precluding Summary Judgment" ("ASOF") appear at pages 11 through 17, [*id.* at 11-17, ¶¶ 34-66]. CoreCivic's responses to the ASOF appear at pages 3 through 5 of its reply. [Dkt. 98 at 3-5, ¶¶ 34-66].

nevertheless shows that an officer unlocked Williams' cell at 1:01 p.m., which "opened [the] door for inmate Williams and [his cellmate] to come out[.]" [Dkt. 92-12 at 7]. Williams was ultimately found not guilty of tampering with locking devices. [Dkt. 92, ¶ 33; Dkt. 97, ¶ 33; *see* Dkt. 92-12 at 1].

### B. THE DISTURBANCE AND SORT'S RESPONSE

While Diaz-Mendez made rounds on Bravo-S, an estimated thirty inmates began exiting their cells. [Dkt. 92, ¶¶ 11-12; Dkt. 97, ¶¶ 11-12]. No out-of-cell inmate threatened Diaz-Mendez. [Dkt. 97, ¶ 40; Dkt. 98, ¶ 40]. Diaz-Mendez testified that he gave verbal commands for the inmates to return to their cells and that those commands went unheeded. [Dkt. 92, ¶ 13]. Williams testified that he heard no such commands. [Dkt. 97, ¶ 13]. In any event, Diaz-Mendez made a "Code 1" radio call for help. [Dkt. 92, ¶ 14; Dkt. 97, ¶ 14].

Several members of CoreCivic's Special Operations Response Team ("SORT") responded to the call. [Dkt. 92, ¶ 16; Dkt. 97, ¶ 16]. CoreCivic deploys SORT teams at DCF multiple times a year when it believes order needs to be restored. [Dkt. 97, ¶ 34; Dkt. 98, ¶ 34]. CoreCivic asserts that the SORT members likewise gave unheeded verbal commands for the inmates to return to their cells, [Dkt. 92, ¶ 17], while Williams does not recall hearing SORT issue any commands, [Dkt. 97, ¶ 17]. It is undisputed that SORT Officer Marcos Del Bosque ("Del Bosque") then used a pepper ball system on the Bravo-S inmates. [Dkt. 92, ¶ 20; Dkt. 97, ¶ 20; Dkt. 97, ¶ 53; Dkt. 98, ¶ 53]. Del Bosque does not recall hearing anything over the radio individuate that

Diaz-Mendez was in danger, that any inmate had a weapon, or that Diaz-Mendez had been injured. [Dkt. 97, ¶ 48; Dkt. 98, ¶ 48-49].

A pepper ball contains a micronized powder and bursts upon impacts with a wall or other hard surface. [Dkt. 92, ¶ 21; Dkt. 97, ¶ 21]. Exposure to an exploded pepper ball hinders breathing, causes burning and teary eyes, and is "not tolerable." [Dkt. 97, ¶ 50; Dkt. 98, ¶ 50]. The parties dispute whether Del Bosque aimed pepper balls directly at inmates, including Williams, or instead fired them into the walls and cells of the unit.[3] It is undisputed, however, that all Bravo-S inmates returned to their cells after the pepper balls were deployed. [Dkt. 92, ¶ 29; Dkt. 97, ¶ 29].

### C. CoreCivic Use-of-Force Practices and Video Retention

Lieutenant Florentino Trujillo ("Lt. Trujillo") testified that it is inappropriate to direct-impact inmates with pepper balls if they are merely refusing an order to lock down, and that direct impact may be appropriate if an inmate is "charging" at an officer with a weapon. [Dkt. 97, ¶ 58; Dkt. 98, ¶ 58]. Both Del Bosque and DCF Warden Joe Norwood ("Warden Norwood") testified that failing to remove an inmate from a cell contaminated with pepper ball powder violates CoreCivic's use-of-force policy. [Dkt. 97, ¶ 62; Dkt. 98, ¶ 62; *see* Dkt. 97-14 (Policy 5-4: *Video Recording Procedures*)]. CoreCivic failed to retain video of the incident, in violation of its own video-recording policies. [Dkt. 97, ¶ 66; Dkt. 98, ¶ 65-66; *see* Dkt. 97-13 (Policy 9-1: *Use of Force and Restraints*)].

---

[3] According to CoreCivic, Del Bosque fired two to three pepper ball rounds into the walls of the upper tier above the cell doors, approximately four times, to achieve area saturation. [Dkt. 92, ¶¶ 20, 24-26, 28]. According to Williams, Del Bosque fired multiple rounds directly at him, and fragments from the exploding pepper balls struck his face, neck, and arms. [Dkt. 97, ¶¶ 20, 24-26, 28, 53-55].

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

At the same time, "at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* A court must therefore examine the factual record in the light most favorable to the party opposing summary judgment, *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995), and "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." *Wolf*, 50 F.3d at 796 (quoting Fed. R. Civ. P. 56(c)).

## III. ANALYSIS

Section 1983 provides that "[e]very person who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To prevail on a claim under § 1983, a plaintiff must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). When "private individuals or groups" are "endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton*, 382 U.S. 296, 299 (1966). CoreCivic does not dispute that it acted under color of state law in housing ODOC inmates at DCF. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 n.13 (10th Cir. 2003).

Because CoreCivic is a private entity acting under color of state law, its liability is governed by the framework set forth in *Monell* and its progeny. *See id.* at 1216 (extending *Monell* to private entities sued under § 1983). That framework requires Williams to first demonstrate that he suffered a violation of a federally protected right. *See Monell*, 436 U.S. at 690. If such a violation exists, Williams must then show the violation was the direct result of a policy or custom maintained by CoreCivic. *Id.* at 694. The Court addresses each step in turn.

### A. ALLEGED CONSTITUTIONAL VIOLATION

The Eighth Amendment's prohibition of cruel of unusual punishment forbids "the unnecessary and wanton infliction of pain" on convicted prisoners. *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citation omitted). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). An excessive force claim therefore "involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1289 (10th Cir. 1999) (quotation omitted); *see also Redmond v. Crowther*, 882 F.3d 927, 936-37 (10th Cir. 2018).[4]

#### 1. Objective Component

The objective component of an excessive force claim is "contextual and responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8 (quotation omitted). The Eighth Amendment "necessarily excludes from constitutional

[4] CoreCivic also invokes *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), for the proposition that the reasonableness of an officer's actions must be judged from the perspective of a reasonable officer on the scene. [Dkt. 92 at 20]. *Kingsley* established an objective standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment, explaining that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" 576 U.S. at 400-01 (quotation omitted). Because Williams is a convicted inmate in ODOC custody, his claim is governed by the Eighth Amendment standard articulated in *Whitley* and *Hudson*. The Court nonetheless agrees the conduct at issue must be evaluated on the basis of the circumstances known to the officers at the time, rather than with the benefit of hindsight. *See Whitley*, 475 U.S. at 320-21.

recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10 (quotation omitted). The inquiry, however, focuses on the nature of the force rather than the extent of the resulting injury. *Wilkins v. Gaddy*, 559 U.S. 34, 37-39 (2010) (per curiam). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

CoreCivic does not separately challenge the objective component, and the Court finds it satisfied for summary judgment purposes. The Tenth Circuit has recognized that a chemical irritant such as "pepper spray is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force." *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001). It is undisputed that the pepper balls Del Bosque deployed released an irritant that hinders breathing, causes burning and teary eyes, and is "not tolerable." [Dkt. 97, ¶ 50; Dkt. 98, ¶ 50]. Williams has also presented evidence that fragments of the exploding pepper balls struck his face, neck, and arms, causing scrapes and abrasions, and that the irritant caused his eyes and skin to burn for hours, aggravated his asthma, and caused headaches. [Dkt. 97, ¶¶ 54-55]. A forceful deployment of a chemical agent producing those effects is not *de minimis*.[5] Accordingly, the dispositive question is whether the evidence, viewed in the light most favorable to Williams, would permit

[5] Because Tenth Circuit and Supreme Court authority resolves the objective component, the Court need not rely on the unpublished district court decision in *Griego v. New Mexico*, No. 05-CV-930-RB/ACT, 2006 U.S. Dist. LEXIS 111698, 2006 WL 8444480 (D.N.M. Jan. 9, 2006), upon which Williams relies. [Dkt. 97 at 18-19].

a reasonable jury to find that the requisite culpable state of mind accompanied the use of force.

**2. Subjective Component**

The subjective component "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Giron*, 191 F.3d at 1289 (quoting *Whitley*, 475 U.S. at 320-21). In making this determination, courts consider "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321 (quotation omitted). From these considerations, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id*.

Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 321-22 (quotation omitted). Nor does the use of force become unconstitutional "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id*. at 319. That deference, however, "does not insulate from review actions taken in bad faith and for no legitimate purpose." *Id*. at 322. Accordingly, the Court must

"determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain … the case should not go to the jury." *Id.*[6]

CoreCivic's argument rests on its account of the incident: after approximately thirty inmates refused verbal commands from Diaz-Mendez and the SORT members, Del Bosque—a certified pepper ball instructor—fired rounds into the walls of the upper tier above the cell doors to achieve "area saturation," a technique taught in pepper ball training and authorized by CoreCivic policy. [Dkt. 92 at 16-21; Dkt. 98 at 6-9]. Williams offers a materially different account: he was inside his cell, or at most peering out of its door after SORT entered the unit, when Del Bosque fired multiple pepper balls directly at him. [Dkt. 97, ¶¶ 53, 56]. These competing accounts present a genuine dispute of fact, and the dispute is material: where Del Bosque aimed, and whether Williams was participating in the disturbance, bear directly on the need for force, the relationship between that need and the amount of force used, and the threat reasonably perceived by the responding officers.

If a jury credits CoreCivic's account, the evidence would support a finding that Del Bosque acted in a good-faith effort to restore discipline in a noncompliant housing unit, and neither the Court nor a jury would be free to second-guess that judgment

[6] Although *Whitley* arose in the context of a motion for directed verdict, the summary judgment inquiry "mirrors the standard for a directed verdict." *Anderson*, 477 U.S. at 250. The question at this stage is therefore whether the evidence, viewed in the light most favorable to Williams, would support such an inference.

in hindsight. *See Whitley*, 475 U.S. at 319-22. But viewing the record in the light most favorable to Williams, a reasonable jury could find that an experienced and admittedly accurate pepper ball operator, confronting a disturbance that involved no reported weapons, threats, or injuries, fired multiple rounds directly at an inmate who was in or at the threshold of his cell and was not participating in the disturbance—using a technique that CoreCivic's own lieutenant described as inappropriate absent an active threat—and that the inmate was then left in a contaminated cell. From that evidence, a jury could draw a "reliable inference of wantonness in the infliction of pain." *Id.* at 322; *cf. DeSpain*, 264 F.3d at 978 (holding that an officer's indiscriminate discharge of pepper spray along a prison tier, absent any justification, "was not a good faith effort to maintain or restore order"). Which account is accurate depends upon the credibility of the witnesses—a determination reserved for the jury. *Anderson*, 477 U.S. at 255.

CoreCivic's remaining arguments do not alter this conclusion. CoreCivic contends that the facts here are closer to *Whitley* than to *Griego*, the unpublished district court decision on which Williams relies. [Dkt. 98 at 8]. The Court agrees that *Griego* is factually distinguishable and, in any event, not binding; the Court does not rely upon it. But *Whitley* is distinguishable as well. There, prison officials confronted an ongoing riot in which an armed inmate held a corrections officer hostage, and the Supreme Court reviewed a full trial record in concluding that the officer's shooting of an inmate on the stairway did not support an inference of wantonness. *See* 475 U.S. at 314-16, 323-26. Here, by contrast, it is undisputed that no out-of-cell inmate

threatened Diaz-Mendez, and Del Bosque recalls no radio report that any inmate was armed or that Diaz-Mendez was injured or in danger. Moreover, the critical facts concerning where Del Bosque aimed remain disputed. Similarly, the Court accepts CoreCivic's premise that officers confronting a group of noncompliant inmates need not determine, in real time, why each inmate is outside his cell before acting to restore order. [Dkt. 98 at 7-8]. That principle supports the use of a group-directed response; it does not necessarily justify deliberately aiming at an individual inmate who, on the evidence viewed favorable to him, was not refusing any order.[7]

Nor is the Court persuaded that Williams' evidence must be disregarded because it concerns departures from CoreCivic's internal procedures. [Dkt. 98 at 9]. CoreCivic is correct that "a failure to adhere to administrative regulations does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993). But Williams does not contend that any policy violation independently establishes his claim. He offers that evidence instead as circumstantial proof bearing on the subjective inquiry—specifically, whether the force used was proportionate to the need and whether any effort was made to temper its severity. The Court has considered the evidence for that limited purpose only and does not treat any departure from CoreCivic policy as a constitutional violation in itself.

Finally, the Court need not resolve the dispute concerning CoreCivic's failure to retain video of the incident. The parties have agreed to address any request for

---

[7] Williams also relies on *McCottrell v. White*, 933 F.3d 651 (7th Cir. 2019). [Dkt. 97 at 20-23]. Although the Court finds the Seventh Circuit's application of the *Whitley* factors instructive, its decision is not binding on this Court, whose conclusion rests on the record before it and the controlling authority discussed above.

relief under Fed. R. Civ. P. 37(e) in pretrial proceedings. [Dkt. 97 at 18 n.3; Dkt. 98 and 9]. The Court has drawn no inference, adverse or otherwise, from the absence of the footage, and expresses no view on whether any remedy under Rule 37(e) is warranted. The genuine dispute identified above arises from the testimony of the witnesses alone.

In sum, because a genuine dispute of material fact exists as to whether force was applied in a good-faith effort to restore discipline or maliciously and sadistically for the very purpose of causing harm, CoreCivic is not entitled to summary judgment on the ground that no constitutional violation occurred.

### B. LIABILITY OF CORECIVIC

The second step in a § 1983 analysis is to determine whether the alleged violation resulted from a policy or custom of CoreCivic. *See Monell*, 436 U.S. at 694. A private entity acting under color of state law cannot be held liable under § 1983 based solely on the acts of its employees. *See id.* at 691; *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Instead, Williams must establish (1) an official policy or custom, (2) causation, and (3) state of mind—that is, deliberate indifference. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769-70 (10th Cir. 2013). In other words, Williams must show that CoreCivic was the "moving force" behind the injury alleged and "a direct causal link between the [entity's] action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). CoreCivic challenges Williams' *Monell* claim on a single ground: that, absent an underlying constitutional violation by one of its officers, there can be no entity

liability. [Dkt. 92 at 21]. Because the Court has concluded that a genuine dispute of material fact exists as to whether such a violation occurred, that argument fails as a matter of law.

In its reply, CoreCivic argues for the first time that, even if an underlying violation were established, Williams cannot satisfy the policy-or-custom, causation, and state-of-mind elements. CoreCivic contends that the periodic deployment of SORT personnel, and any additional compensation associated with SORT participation, is a legitimate penological practice rather than evidence of an unconstitutional custom, and that a single incident involving a non-policymaking employee is insufficient to establish entity liability. [Dkt. 98 at 9-10]. As a general rule, courts do not consider arguments raised for the first time in a reply brief, because the nonmoving party has no fair opportunity to respond. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."); *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998); Fed. R. Civ. P. 56(f)(2).

That rule applies here. Because CoreCivic's opening motion did not challenge the policy-or-custom, causation, or state-of-mind elements, Williams had no occasion to marshal the evidence supporting those elements in his response. The Court therefore declines to consider the arguments CoreCivic raised for the first time in its reply. In so ruling, the Court expresses no view on the merits of those arguments. Williams will bear the burden at trial of proving each element of his *Monell* claim under the "rigorous standards of culpability and causation" that govern entity

liability, *Brown*, 520 U.S. at 405, and CoreCivic remains free to challenge the sufficiency of that proof under Fed. R. Civ. P. 50. Accordingly, CoreCivic is not entitled to summary judgment on Williams' *Monell* claim.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that CoreCivic's motion for summary judgment [Dkt. 92] is hereby **DENIED**.

DATED this 7th day of October, 2026.



JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE